DECISION AND JUDGMENT ENTRY
{¶ 1} This case is before the court on appeal from the Lucas County Court of Common Pleas, Juvenile Division, which terminated the parental rights of appellant Natasha B. and granted permanent custody of appellant's three children to appellee Lucas County Children's Services ("LCCS"). For the reasons that follow, we affirm the decision of the trial court.
 {¶ 2} Appellant is the mother of five children, three of whom are at issue in this case: Mark B., born in July 1995, and twins Ryan B. and Rayna B., born in July 2002. Mark's father has never been determined, and Dennis B. is the father of the twins. He is not a party to this appeal. The facts of this case are adduced from the permanent custody hearing held on March 18, 2004.
 {¶ 3} Lori Wilson, appellant's caseworker, testified that she first began working with appellant in June 2002, shortly before the twins were born, but appellant's history with LCCS began in 1995. In 1995, appellant left her two older children with relatives without making provisions for their care. Then, after Mark was born, LCCS received another referral because of appellant's depression and possible substance abuse. In 1999, LCCS investigated bruises on one of appellant's older sons, and that boy reported that his mother hit him with a belt. Appellant told an investigator that she sometimes "feels like killing him." Sometime later, appellant left Mark with her mother, who was not a suitable choice as a caregiver because she still had children at home who were being removed. When Mark and his minor aunts were removed from his grandmother's house, appellant's whereabouts were unknown; LCCS was unable to locate her for two months. She was apparently incarcerated during at least a part of this time.
 {¶ 4} While appellant was pregnant with the twins, she had two positive urine screens for marijuana. At the time the twins were born, neither appellant nor Dennis were employed, and they had no housing. The twins were taken into the custody of LCCS upon their release from the hospital. The case plan for Natasha included securing housing and utilities, attending parenting classes, attending counseling, and undergoing substance abuse treatment. The goal at that time was reunification.
 {¶ 5} Wilson testified that appellant made good strides with her case plan; she had a house, she had completed substance abuse treatment, and she was engaged in ongoing counseling and parenting education. The twins were reunited with appellant and Dennis on June 17, 2003, when they were 11 months old. Appellant and Dennis were living together at the time. However, Mark and appellant were not reunited at this time because Mark had behavioral problems and LCCS was concerned about appellant being overwhelmed by having all three children home at the same time. (Mark had been diagnosed with Attention Deficit and Hyperactivity Disorder and was taking medication.)
 {¶ 6} On July 1, 2003, approximately two weeks after the twins were sent home, appellant and Dennis were engaged in domestic violence. Wilson and another LCCS employee went to the home and had appellant and Dennis sign a safety plan. The plan provided that "Dennis will not reside in the home. His contact with the twins will occur in his mother and father's home * * *." Both Natasha and Dennis received a copy of the safety plan, and Dennis gathered his belongings and left the house.
 {¶ 7} On July 21, 2004, approximately five weeks after the twins' return, LCCS received a referral that the twins were not well; they had been vomiting and were lethargic, Ryan was "whiney," and Rayna's leg was sore. Wilson went out to the house immediately upon hearing this. When she arrived at approximately 6:00 p.m., appellant was getting out of her car and entering the house with a bag of food from McDonald's. Dennis was home alone with the twins. Wilson told appellant that she needed to see and undress the twins. According to Wilson, Rayna cried when her diaper was removed and seemed to be particularly sensitive on her right side. Ryan cried when his arms were lifted above his shoulders. He had bruises on the left side of his torso, a bruise in the groin area, and a bruise on his face. When Wilson asked the parents about the children's injuries, appellant responded that she did not know how Ryan got bruised. Later she said that Ryan might have gotten bruised when she carried him up the steps a certain way. Appellant told Wilson that neither she nor Dennis had hurt the children. Wilson told the parents that the children needed to go to the hospital.
 {¶ 8} Once at the hospital, the children were examined by two different doctors in Wilson's presence. Wilson noted that, once again, Ryan cried when his arms were lifted over his shoulders, and Rayna cried when her diaper was removed and when her sock was removed from her right foot. The doctors took x-rays. After the examination and the x-rays, one of the doctors asked to speak with Wilson and the other doctor asked to speak with the LCCS investigator. The doctor told Wilson that Ryan's bruises appeared to be fingerprints, but he could not be sure. He also stated that the x-rays appeared to be normal. He sent the children home with instructions to follow up with their primary care physician.
 {¶ 9} The next day, Wilson received a call from St. Vincent Hospital indicating that the x-rays had been re-read and there was a corrected report. Based on this corrected report (which will be more fully discussed below), the twins were removed from appellant's home. Appellant visited with the twins regularly once they were removed, though the visits were supervised and attended by a security guard.
 {¶ 10} Wilson testified about the twins' whereabouts in the 48 hour period preceding their hospital visit on Monday, July 21. On the previous Saturday and Sunday, they were having supervised visitation with Dennis at Dennis' parents' home. On Monday, the twins' protective daycare provider picked up the children and kept them for the day. Wilson indicated that LCCS conducted an investigation of Ryan's injuries and physical abuse was substantiated, but the perpetrator was never identified.
 {¶ 11} Wilson explained that LCCS was seeking permanent custody of the children because of appellant's long history with the agency, because of the domestic violence, and because of Ryan's injuries. Wilson expressed concern that appellant knew something was wrong with the twins on the morning of July 21 (because she said as much to the daycare worker when she dropped them off that morning), but she did not seek medical attention for them. Appellant had attended a staffing with Wilson that same morning and said nothing of Ryan's bruises or about the children not being well. Appellant told Wilson that the daycare worker suggested seeking medical help for the twins that morning, but appellant did not do so. Wilson testified that she believed that the children were at high risk for being injured again, given the history of domestic violence in the family and the injuries to Ryan, which were left unattended to until LCCS became involved. LCCS concluded that appellant did not meet the case plan goal of providing a safe home for the children.
 {¶ 12} Wilson also testified about the children's current living situation. Mark is in a separate home from Ryan and Rayna, but they visit with each other weekly. She also indicated that LCCS would seek an adoptive home for the three children together.
 {¶ 13} Dennis' sister Dawn B. testified about the violence that Dennis inflicted on appellant before the twins were born. She testified that she lived downstairs from appellant, and she observed Dennis hit appellant in the face, push her, punch her in the back, pull a knife on her, and punch holes in the walls. Though she described Dennis' temperament as "very bad," she indicated that she never saw him harm the children. According to Dawn, appellant would tell Dennis to leave and might have even called the police. She testified that appellant was a good mother who would take precautions if she perceived any danger to her children. She also testified that appellant and Dennis are no longer together.
 {¶ 14} Dr. Randall Schlievert, a pediatrician at Medical College of Ohio and St. Vincent Mercy Hospital and director of the Child Maltreatment Program, also testified. He became involved in the case on July 22, 2003, when a nurse from the LCCS Medical Clinic called him about Ryan's injuries. The day after Ryan was released from the emergency room, a radiologist performed an "official reading" of the x-rays and determined that Ryan had bone fractures.[1] The nurse reported that Ryan was vomiting and was lethargic. Dr. Schlievert advised the nurse that Ryan should be hospitalized for an evaluation.
 {¶ 15} Dr. Schlievert examined Ryan on July 23, 2003. Upon examining him and reviewing his x-rays, Dr. Schlievert concluded that Ryan was abused and his injuries were inflicted on him by another. Dr. Schlievert testified that Ryan had "numerous injuries" that were "highly specific or indicative of an abused child." He noted that Ryan had several faint bruises on his jaw, a bluish-brown bruise on the left side of the chest, three "healing" rib fractures on the left side, and a "fresh" rib fracture on the right side. He also noted bleeding in the subdural space between the skull and the brain, and numerous retinal hemorrhages in the left eye and a lesser amount in the right eye. With regard to the bruising on the side of the chest, Dr. Schlievert testified that this is an area where one does not usually see bruising in a healthy child. All of these injuries, taken together, indicated that Ryan had been forcefully shaken.
 {¶ 16} Dr. Schlievert elaborated on the rib fractures. He concluded that three rib fractures were healing because the x-ray detected "callus" — essentially new bone growth around the fracture. This takes a week to ten days to develop. He estimated that Ryan's older fractures were several weeks old — perhaps up to four to six weeks old. The fresh fractures occurred within the previous couple of days. Dr. Schlievert concluded that Ryan was injured on at least two separate occasions. The bleeding in the subdural space, the newer rib fracture, and the retinal hemorrhages all occurred within 24 hours of the time he first became sick.
 {¶ 17} Dr. Schlievert testified that these types of injuries indicate that the child is at "significant risk for permanent disability or even death if the child is returned to the environment that caused these injuries." He would not, he testified, recommend that the child be placed back in the home in which the injuries were inflicted.
 {¶ 18} On cross-examination, Dr. Schlievert was asked to describe each injury again and opine as to possible causes. He indicated that the bruising on the jaw was an impact that would break the capillaries. It might have been a punch, or it could be from being "shaken and thrown or slammed on to something." He said that occasionally a physician will see bruising when a child is gripped tightly, but not typically in 11-monthold children leading a normal life. The bruising on the left side of the chest is not normally caused by falling or bumping into things, which usually results in bruising on the chin, forehead, or shin. The bruise on Ryan's chest, according to Dr. Schlievert, was likely caused by a hand during a shaking episode. The rib fractures require a great deal of force. One does not usually break an infant's ribs even upon performing CPR because an infant's chest is elastic and can withstand a fair amount of compression. Even falls off of beds or couches or down the stairs do not usually cause rib fractures in infants. Rib fractures in infants are seen in serious motor vehicle crashes, falls from a third or fourth story window, or shaking. Similarly, bleeding in the subdural space is not usually caused by a fall or a bump. This type of injury is seen following "significant accidents" or moderate to severe shaking. According to Dr. Schlievert, the injury happens when a child is shaken so hard that the brain actually rotates within the skull, putting strain on blood vessels connecting the brain to the skull. The blood vessels snap and blood leaks out. With regard to the retinal hemorrhages, these, too, are caused only by significant force. The force required to cause retinal bleeding is greater even than the force experienced in a fall from a window, a fall on a playground, or in car accidents. These injuries happen from severe shaking or from "very limited, other circumstances." The type of force required to cause retinal hemorrhaging can be lethal.
 {¶ 19} Dr. Schlievert was questioned about his conclusion that a child with Ryan's injuries is at significant risk for re-injury or death. He testified that he came to his conclusions for two reasons: First, it appeared from the examination and x-rays that Ryan had already been abused twice. Second, studies conclude that 20 to 30 percent of abused children are re-injured when sent back to the environments from which they came. In cases where shaken baby syndrome was not properly diagnosed initially, 30 to 40 percent of those children return to the hospital with "significant, long-term, permanent disability, including blindness, cerebral palsy, mental retardation, [and] learning disabilities * * *." He also quoted a study of 100 or so cases of shaken baby syndrome where five of the children died; four of them died after being returned to their home.
 {¶ 20} Dennis' attorney asked Dr. Schlievert on cross-examination about the emergency room personnel failing to diagnose the rib fractures. The attorney asked Dr. Schlievert whether one could then expect a lay person to know that a child had such fractures when hospital staff did not diagnose them. The doctor responded that, while a lay person would not know that the child had fractures, the lay person would know that the child was uncomfortable and that something was wrong when the child was crying and irritable and was vomiting.
 {¶ 21} On cross-examination by appellant's attorney, Dr. Schlievert agreed that, based on the timing of the symptoms, it is possible that Ryan's injuries (at least the later ones) could have taken place when he was in daycare on Monday, July 21, 2003.
 {¶ 22} On re-direct examination, Dr. Schlievert testified that siblings of an abused child are also at significant risk for abuse. The attorney also asked whether a child with the type of injuries described would be in obvious discomfort. Dr. Schlievert testified:
 {¶ 23} "With these types of injuries, a reasonable person would know that something is not right. There may not be discomfort and the reason I say that is because it is so hard with an eleven month old to know what this child means by crying.
 {¶ 24} "I noted that when I picked Ryan up that he cried, when I would grab him around his chest and that obviously fits with him having broken — a fresh broken rib. Shaken children generally do not act normally after the episodes.
 {¶ 25} "The range of what that non-normal state is, is large. It can be lethargic and fussy and irritable, all the way up to comatose or brain dead. But generally someone who is familiar with that child generally will recognize that something is not right. They just may not know that that time that it was due to an injury."
 {¶ 26} Appellant testified in her own behalf. She discussed her history with LCCS. According to appellant, her son Mark was taken into the custody of LCCS while she was incarcerated. When she was released, she tried calling her mother's caseworker to find out where he was. The caseworker never returned her calls. She testified that, since her involvement with LCCS, she completed everything LCCS required her to do: she went into counseling, she sought help from a parenting program, she got a job, and she got an apartment. According to appellant, she sought help on her own initiative from Sheila Brubaker-Wheeler, a counselor from a parenting program called "Help Me Grow." Because of this contact, she became involved with a pregnancy center, which is how she was able to get cribs for the twins. Through Brubaker-Wheeler, appellant was also able to use community resources to get clothing and food for the twins. Brubaker-Wheeler also put her in touch with four parenting-type programs that appellant completed. According to appellant, LCCS linked her to no programs except substance abuse treatment, which she also completed.
 {¶ 27} Appellant discussed her work. She is a home health aid and has a certificate in home care hospice, CPR, and infant health. At the time of the hearing in May 2004, she had been at this job for 13 months.
 {¶ 28} Appellant was questioned about the July 1, 2003 domestic violence incident that led to the safety plan. She testified that she and Dennis had been arguing and it escalated. When she was holding Ryan in her lap, Dennis struck her in the head. She called both LCCS and the police. When the police officer came to the house to take a report, he gave appellant a slip to complete to get a protective order against Dennis. According to the officer, however, Dennis would need to be apprehended and taken before a judge before the protective order would be effective. Appellant never completed the papers for the protective order, reasoning that there was a warrant for his arrest and, as long as he was out of the house, she would be safe.
 {¶ 29} With regard to the safety plan, appellant testified that she understood it to mean that she and Dennis were not to be alone together; she did not understand it to mean that Dennis could not be alone with the children. She denies having received a copy of it. According to appellant, when Lori Wilson, the caseworker, came to the house because of the domestic violence incident on July 1, 2003, she instructed Dennis to keep a key for the house so that he could pick up the rest of his property. (Wilson denied having so instructed Dennis.) Appellant stated that Dennis used his key to gain entrance to appellant's apartment on July 21, 2003, the day the twins' injuries were discovered. When Dennis entered the home, appellant left, as she understood that they were not to be alone together. She testified that she went to McDonald's so that she could have food to take to the emergency room later, as she anticipated that she would be taking the twins there and spending a considerable amount of time.
 {¶ 30} Appellant's attorney asked appellant why she anticipated going to the emergency room that night. Appellant indicated that Ryan was cranky because he was teething, and she told the daycare worker to keep an eye on him. She indicated to the daycare worker that if Ryan was not better by the end of the day, she would take him to the hospital. Appellant testified that the children seemed well over the weekend but that Ryan was prone to vomiting and was a cranky baby. She denied hurting the children, and said she no longer has contact with Dennis and would do whatever it took to protect her children.
 {¶ 31} On cross-examination, appellant testified that, although LCCS referred her to counseling following the July 1, 2002 domestic violence incident, she refused to go, stating, "I know how not to get beat up." Appellant discussed the safety plan again. She acknowledged that she signed it but stated that she did not read it.
 {¶ 32} Appellant testified about Ryan's affect on the morning of July 21, 2003. She stated that he was teething and was in discomfort from that — he had a fever, he was screaming, and he had diarrhea. Nevertheless, she stated that he was "acting like himself." She undressed and bathed him that morning, and he did not react in any particular way when she lifted him into the bath.
 {¶ 33} Appellant also discussed the circumstances surrounding Mark's removal from her. She acknowledged that she was incarcerated on a warrant for non-payment of a fine (the charge was for discharging a firearm), but she contended that Mark was not staying with her mother at the time he was removed; he was staying at a neighbor's house.
 {¶ 34} With regard to the couple of days before Ryan's injuries were discovered, appellant explained that the twins had spent Saturday and Sunday with Dennis and his parents but had stayed overnight with her. She testified that she had no concerns about the children's safety when they were with Dennis and his parents. She did, however, have a concern with the protective daycare worker. When asked to elaborate, appellant explained that she thought the worker was too old and took care of too many children.
 {¶ 35} Appellant denied that Ryan had a bruise on his face or on his chest, and her testimony was unclear about whether she ever noticed any bruising on his ribs. Her testimony was as follows:
 {¶ 36} "Q: Okay. When did you first see the bruises on his waist, chest, whatever?
 {¶ 37} "A: When I took his shirt off.
 {¶ 38} "Q: When?
 {¶ 39} "A: When Lori [the caseworker] came.
 {¶ 40} "Q: I'm sorry?
 {¶ 41} "A: When Lori came.
 {¶ 42} "Q: You did not see them?
 {¶ 43} "A: Prior?
 {¶ 44} "Q: Prior to that time?
 {¶ 45} "A: Not like that. (Witness shakes head.)
 {¶ 46} "Q: What does `not like that' mean?
 {¶ 47} "A: They were darker by the time Lori got there.
 {¶ 48} "Q: Darker than what?
 {¶ 49} "A: Darker than they were.
 {¶ 50} "Q: When?
 {¶ 51} "A: When Lori got there, the first thing they did, of course, is take the kid's [sic] clothes off. That's when you could see bruises on Ryan. But earlier that day, were they dark, were they — they — were they noticeable? No. But for them to be that dark later, they had to have been there earlier. So that's just common sense."
 {¶ 52} Appellant specifically denied seeing bruises on Ryan when she bathed him that morning. She testified that she did not see Ryan vomit that day, although she was told Rayna had. Appellant was asked whether she went to the hospital with the children the second time they were examined (after the radiologist read the x-rays). The following exchange took place:
 {¶ 53} "Q: So you didn't go to the hospital the second time?
 {¶ 54} "A: I didn't know. Nobody told me. Nobody told me. I didn't even know Ryan's injuries were that serious. I didn't know. I didn't know he had injuries, for God's sake. The emergency room asked — he was fine. I didn't think nothing was wrong with my baby because he was teething anyway."
 {¶ 55} Finally, she denied that Dennis ever struck or shook the children.
 {¶ 56} The last witness was Sheila Wheeler-Brubaker, a coordinator for the Friendly Center's Help Me Grow program (a parenting program). She first met appellant when she came into the Friendly Center in June 2002, when she was pregnant with the twins. She testified that she has attending visitation between appellant and her children. She stated, "I have observed, you know, very good interaction actually between mother and father and the children. Very positive, nurturing, loving interaction, engagement with the children." She never observed or suspected child abuse at the hand of either parent. Later, on cross-examination, she testified that she did not think appellant capable of harming her children. She noted that Ryan was often a fussy baby.
 {¶ 57} Wheeler-Brubaker was asked whether she had any concerns about the protective daycare worker. She testified that once during the summer, when the daycare worker dropped the children off with appellant, she noticed that it was very hot in the car.
 {¶ 58} Appellant completed a parenting program called Gonas. This program, according to Wheeler-Brubaker involves "empowering yourself, making better choices. You know, being the leader of your own life more or less, kind of empowering yourself is what it's about." She is also aware that appellant completed substance abuse treatment. When asked about appellant's progress from June 2002 to the twins' removal 13 months later, Wheeler-Brubaker testified that appellant secured housing, got a driver's license, and bought and maintained a car. She applied to school at Owens Community College but did not attend because the babies were born soon before she was to start.
 {¶ 59} Finally, Wheeler-Brubaker testified that tension existed between appellant and her caseworker, but she did not think this tension had any effect on LCCS's efforts to assist appellant. She testified that appellant received assistance from LCCS — "very much so" — according to Wheeler-Brubaker.
 {¶ 60} Following the testimony, the attorneys made closing remarks. While the children's guardian ad litem did not testify, her report was admitted "for dispositional purposes," and she provided closing argument. (The guardian ad litem filed reports recommending that LCCS have permanent custody of all three children.) In closing argument, she expressed her doubt in appellant's credibility. Following closing arguments, the trial court ruled from the bench that the motion for permanent custody would be granted. In so ruling, the trial court remarked that the children needed permanency, stability, security, and safety. He believed that these needs would best be met by a grant of permanent custody to LCCS. In a subsequent journal entry, the trial court made findings under R.C. 2151.414(E)(3), (4), (10), (14), and (16) and under R.C. 2151.353(A)(4). Appellant now appeals, setting forth the following assignment of error:
 {¶ 61} "The trial court's decision granting permanent custody to Lucas County Children's Services Board was against the manifest weight of the evidence presented."
 {¶ 62} R.C. 2151.414(B)(1)(a) provides:
 {¶ 63} "(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
 {¶ 64} "(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the parents within a reasonable time or should not be placed with the child's parents.
 {¶ 65} "(b) The child is abandoned.
 {¶ 66} "* * *."
 {¶ 67} In its decision, the trial court found by clear and convincing evidence that
"Ryan and Rayna [B.] cannot and should not be placed with either parent within a reasonable period of time, and that, pursuant to ORC 2151.414(D) an award of permanent custody to LCCS is in the children's best interests." Though not citing the statute specifically, this is a finding under R.C. 2151.414(B)(1)(a). The court also made a finding that the children were abandoned, which is not supported by the record, at least as far as appellant is concerned. Lori Wilson, the caseworker, testified that appellant regularly visits with all three children. Dennis, on the other hand, did not visit with the twins from September 2003 to March 2004, saying that it was "difficult to see the kinds in that setting." Since the finding that the children are abandoned is not supported by the record, we will proceed to review the trial court's findings under R.C.2151.414(B)(1)(a).
 {¶ 68} In finding that the children cannot be placed with a parent within a reasonable time or cannot be so placed, the trial court made findings under R.C. 2151.414(E)(3), (4), (10), (14), and (16). Those sections provide:
 {¶ 69} "(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353
of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
 {¶ 70} "* * *.
 {¶ 71} "(3) The parent committed any abuse as described in section2151.031 of the Revised Code against the child, caused the child to suffer any neglect as described in section 2151.03 of the Revised Code, or allowed the child to suffer any neglect as described in section 2151.03
of the Revised Code between the date that the original complaint alleging abuse or neglect was filed and the date of the filing of the motion for permanent custody;
 {¶ 72} "(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
 {¶ 73} "* * *.
 {¶ 74} "(10) The parent has abandoned the child.
 {¶ 75} "* * *.
 {¶ 76} "(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.
 {¶ 77} "* * *.
 {¶ 78} "(16) Any other factor the court considers relevant."
 {¶ 79} As noted in the statute, a court's findings under R.C.2151.414(E) must be supported by clear and convincing evidence. The Supreme Court of Ohio has held that clear and convincing evidence is:
 {¶ 80} "that measure or degree of proof which is more than a mere `preponderance of the evidence,' but not to the extent of such certainty as is required `beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Cross v. Ledford
(1954), 161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 81} The trial court also made a finding that permanent custody to LCCS was in the best interests of the children. To make this determination, the trial court must consider certain factors. R.C.2151.414(D) provides as follows:
 {¶ 82} "(D) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:
 {¶ 83} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 84} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 85} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 86} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 87} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
 {¶ 88} "* * *."
 {¶ 89} First, we shall address the trial court's findings that the children cannot be placed with appellant within a reasonable time or should not be so placed. The trial court made a finding that:
 {¶ 90} "LCCS made reasonable efforts to prevent the need for removal of the children, and the continued need for removal from their home, however such efforts were unsuccessful due to the parent's inability to protect the children from harm. Such efforts included case plan management, a referral to mental health counseling and domestic violence counseling, parenting classes, and visitation."
 {¶ 91} Though the trial court did not specifically say so, this finding is essentially a finding under R.C. 2151.414(E)(1), which provides:
 {¶ 92} "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties."
 {¶ 93} Specifically, the trial court noted appellant's inability to protect the children from abuse. Appellant disputes this finding, arguing that appellant had no notice that Dennis, Dennis' parents, or the daycare provider were a danger to the children, and in fact these individuals were approved by LCCS to provide care for the children. She argues that she should not be held accountable for knowing that abuse was going to occur before it did.
 {¶ 94} Appellant's arguments are unpersuasive for two reasons. First, neither the trial court nor LCCS places fault with appellant for not predicting the abuse. However, once the abuse did occur, appellant did not seek prompt medical attention. There was ample evidence that the children were in obvious discomfort and that Ryan was bruised. Dr. Schlievert testified that anyone familiar with a child would know that a child in Ryan's condition was not well. According to Wilson's testimony, appellant acknowledged that the daycare worker advised her that the children needed medical attention and she did not seek such medical attention until Wilson and an LCCS investigator appeared at her house to examine the children. It was the LCCS workers who told appellant that the children needed to go to the hospital. The trial court apparently did not give credence to appellant's after-the-fact, uncorroborated testimony that she had planned to take the children to the hospital just as the caseworker and investigator arrived. Further, the evidence was clear that Ryan had been injured once before: He had healing rib fractures very likely inflicted during the time he was living in appellant's house. Again, Ryan must have been in obvious discomfort, and appellant did not seek medical attention and allowed the abuse to occur a second time.
 {¶ 95} Second, the record contained ample evidence of Dennis' volatile temper. Despite this temper, appellant allowed him to remain alone with the children after she signed a safety plan agreeing not to do so. Again, the trial court must not have credited appellant's testimony that she signed the safety plan but did not read it. And while it is true that Ryan's injuries did not take place on the one known occasion that he was alone with his father, this one occasion leads one to wonder how many other times appellant allowed Dennis to be alone with the children after the safety plan was put into effect and whether she can be trusted to protect her children.
 {¶ 96} The record establishes that LCCS provided support and services to appellant to help her regain custody of her children. Despite this assistance, appellant was unable to provide a safe environment for the children. We find that the record supports, by clear and convincing evidence, the trial court's findings under R.C. 2151.414(E)(1).
 {¶ 97} This same evidence, and for the same reasons, supports the trial court's findings under R.C. 2151.414(E)(4) and (14) — that appellant is unwilling to provide "an adequate permanent home" for the children and is unwilling to protect the child from physical abuse or neglect.
 {¶ 98} The trial court also made a finding under R.C. 2151.414(E)(3) that appellant committed abuse as described in R.C. 2151.03. That section provides:
 {¶ 99} "(A) As used in this chapter, "neglected child" includes any child:
 {¶ 100} "* * *.
 {¶ 101} "(3) Whose parents, guardian, or custodian neglects the child or refuses to provide proper or necessary subsistence, education, medical or surgical care or treatment, or other care necessary for the child's health, morals, or well being;
 {¶ 102} "* * *.
 {¶ 103} "(6) Who, because of the omission of the child's parents, guardian, or custodian, suffers physical or mental injury that harms or threatens to harm the child's health or welfare[.]"
 {¶ 104} "* * *."
We find that the trial court's finding under this section is supported by clear and convincing evidence given that appellant did not seek medical help for the children until LCCS intervened and given that Ryan had suffered previous physical abuse.
 {¶ 105} According to R.C. 2151.414(E), even a single finding under subsections (E)(1) to (E)(16) requires the court to "enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent[.]" We therefore hold that the trial court did not err in finding that the children cannot or should not be placed with their parent within a reasonable time.
 {¶ 106} The trial court also found that it was in the children's best interests to grant permanent custody to LCCS. In so finding, the court noted the children's need for a permanent, stable home and noted that granting permanent custody to LCCS would facilitate this need. The court also noted the children's wishes, as expressed through their guardian ad litem. Given the evidence, we cannot say that the trial court erred in so finding. Appellant's sole assignment of error is found not well-taken.
 {¶ 107} It is important that we separately address several contentions appellant raises in her brief. First, she contends that several of the court's findings are unsupported by or contradicted by the record, including the findings that: (1) despite LCCS's effort, appellant is unable to protect her children; (2) relative placement was not a viable option; (3) appellant committed abuse or allowed her children to be neglected; and (4) appellant lacked commitment to her children and failed to visit them. We have already addressed most of these contentions, but two deserve attention. First, in connection with her argument challenging the trial court's finding that she is unable to protect her children, appellant contends that the record establishes that the children were out of appellant's care for the entire 48 hour period preceding Ryan's injury. This is not true. Appellant, herself, testified that, while the children were with Dennis and his parents the preceding weekend, they spent the nights with appellant. Second, appellant contends that no record evidence supports the trial court's finding that relative placement was not an option. This is also untrue. Wilson testified that LCCS investigated relative placement and found nobody suitable.
 {¶ 108} Appellant also contends in her brief that the trial court's decision is insufficient because it does not align the evidence with each of its statutory findings. To support this contention, appellant cites our decision in In re Rashaun B. and Angelique, 6th Dist. No. L-03-1306,2004-Ohio-7349. In Rashaun, we noted that there was "no attempt by the court to explain which of its findings relate to which provision or how any, or all, of the findings equate to one of the (E)(1) through (15) findings." Id. at ¶ 23. However, we also noted that "the findings are not only unsupported by the record, but are frequently contradicted by it." Id.
 {¶ 109} In this case, the trial court made its findings of fact and then made its statutory findings. It did not, as in Rashaun, specify which factual finding(s) aligned with which statutory finding. We would have preferred that the trial court had done this, and our job as a reviewing court certainly would have been made easier had the trial court done so. However, this case does not require reversal as Rashaun did, because in this case the findings are supported by, and not contradicted by, the record.
 {¶ 110} Upon due consideration, we find that the decision of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Pursuant to App.R. 24, appellant is ordered to pay the court costs of this appeal.
Judgment Affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Handwork, J. Pietrykowski, J. Skow, J. Concur.
[1] Dr. Schlievert explained that radiologists are not always in the hospital 24 hours a day, so the emergency room personnel will perform a preliminary reading of the x-ray and a radiologist will perform the official reading when he or she comes on duty. According to Dr. Schlievert, though it is unfortunate, emergency room personnel sometimes miss things in their reading of an x-ray.